**Affirmed and Memorandum Opinion filed September 23, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00477-CV

---

### IN THE INTEREST OF G.S., A CHILD

---

**On Appeal from the 309th District Court
Harris County, Texas
Trial Court Cause No. 2012-74334**

---

# M E M O R A N D U M   O P I N I O N

Appellant G.B.C. (the Father) appeals from the decree terminating his parental rights to a daughter, G.S. (the Child). The Father brings four issues arguing that (1) the trial court erred in denying his motion for new trial; (2) the evidence is insufficient to support termination; (3) the Texas Department of Family and Protective Services (the Department) failed to make reasonable efforts to reunite him with the Child; and (4) the trial court erred in ordering reimbursement for his court-appointed counsel's fees. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2012, the Department received a referral alleging physical

abuse of the Child shortly after her birth. The referral alleged that at the time of the Child's birth, M.C.S. (the Mother) tested positive for amphetamines and methamphetamines and the Child tested positive for amphetamines and methadone. On December 19, 2012, the Department filed suit for protection of the Child, naming the Father as the Child's alleged father. The following day, the trial court issued emergency temporary orders granting the Department temporary managing conservatorship, and the Child was placed in foster care.

The record reflects that the Father was a party in a previous suit for termination of the Mother's child, A.D.S. (the Brother), who was born in 2008. The Father was alleged to be the Brother's biological father. The Brother was placed in the Department's custody after it was learned that the Mother drank while pregnant and the Brother suffered from Fetal Alcohol Syndrome. In 2009, both the Mother's rights and any rights the Father had to the Brother were terminated. The decree, which was admitted in evidence at trial in this proceeding, recited that the Father was duly cited, but failed to appear or answer and his rights were terminated pursuant to Family Code Section 161.002. *See* Tex. Fam. Code § 161.002.[1] The Brother was placed in the care of his maternal grandmother (the Grandmother), who later formally adopted him.

The trial court conducted an adversary hearing in the underlying proceeding on January 3, 2013. The record reflects the Father was present at the hearing and

---

[1] Section 161.002 provides:

(b) The rights of an alleged father may be terminated if:

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160.

Tex. Fam. Code § 161.002(b)(1). By filing an admission or counterclaim for paternity, the alleged father is given the right to require the State to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of the child. *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.).

was personally served with process. The court signed an order finding, among other matters, that the Father was not indigent. The court ordered the Father to comply with each requirement set out in the Department's service plan, which was filed with the court February 4, 2013. The plan required the Father to submit to DNA testing to confirm his parentage and to random drug testing. In addition, the Father was ordered to pay child support, complete domestic violence, anger management, and parenting classes, among other tasks.

On February 14, 2014, a status hearing was held. At that time, the Father signed an affidavit of indigence, claiming he was paid $998 in his last paycheck, he paid $700 per month in rent, he had $500 in his bank account, and he paid $2,600 per month to an attorney. The parties agree that Susan Solis was appointed as attorney ad litem to represent the Father at the conclusion of the hearing, but our record does not contain a written order appointing her. On June 13, 2013, Solis filed an answer on behalf of the Father denying the allegations in the Department's petition. The record reflects Solis appeared on behalf of the Father at the permanency hearings held June 27, 2013 and October 3, 2013.

At the hearing held October 3, 2013, the Father acknowledged that he had completed DNA testing that confirmed he is the Child's biological father. The Father also testified about completion of some of his required services and testified he had been employed for three years. On cross-examination, the Father admitted that he had been working as an engineer for the past three years, he made $70,000 per year, he had been living with his sister since January, he did not pay anything for rent, and he had not paid any child support. At the conclusion of the hearing, the court removed the Father's appointed counsel and urged the Father to retain counsel before the trial setting in December. There is no written order discharging Solis.

At the same hearing, the trial court signed an order permitting the Child's

maternal grandparents (the Grandparents) to have unsupervised visits with the Child. The Grandparents later filed a petition in intervention seeking conservatorship of the Child.[2]

The court conducted a permanency hearing on December 12, 2013, when the case was originally set for trial. The record reflects the Father appeared with retained counsel, David Rushing. At the request of the Attorney Ad Litem for the Child, the court granted an extension of the statutory dismissal date and reset trial to January 23, 2014.

New counsel for the Father, Jerry Acosta, was granted leave to substitute for Rushing on January 23, 2014, the first day of trial. Acosta then made an oral request for a continuance, which was denied. Trial to the court briefly commenced. Acosta was assisted during the trial by co-counsel, James Pons. Trial resumed February 27 and 28, 2014, and concluded on March 6, 2014. The trial court signed a final judgment on March 27, 2014, adjudicating the Father's parentage, terminating his parental rights to the Child, and appointing the Grandparents as the Child's sole managing conservators. The judgment recited the trial court's findings that parental termination is in the Child's best interest and that the Father committed acts establishing the predicate termination grounds set out in subsections E, N, and O of Texas Family Code Section 161.001(1). Tex. Fam. Code §§ 161.001(1)(E), (N) & (O); 161.001(2).[3] The decree also recited that appointment of a parent as conservator would not be in the Child's best interest because the appointment would significantly impair the Child's physical health or emotional development. *See* Tex. Fam. Code § 153.131. The trial court's judgment

---

[2] Another party who knew the Mother when she resided in California had intervened earlier in the case, seeking conservatorship of the Child. This intervention was non-suited before trial.

[3] The Mother's parental rights were also terminated, but she did not contest the termination and has not appealed.

also recited that the Father is not indigent and ordered the Father to reimburse Harris County for the appointed ad litem attorney's fees in the amount of $2,750 and to pay $4,500 in attorney's fees to the Grandparents' attorney. The Father filed a timely motion for new trial, which was denied after a hearing on May 6, 2014. The Father also filed a timely notice of appeal.

## II. ISSUES ON APPEAL

In his first issue, the Father claims the trial court should have granted him a new trial because his appointed counsel was wrongfully released close to trial and the court erred in denying his subsequent continuance requests. In his motion for new trial, he alleged he was entitled to appointed counsel, his appointed counsel was improperly released, and his appointed counsel provided ineffective assistance of counsel, depriving him of a fair trial. In his second issue, the Father generally challenges the legal and factual sufficiency of the evidence to support parental termination. He specifically challenges both the predicate finding under Family Code section 161.001(1)(N) and the trial court's best interest finding. In the Father's third issue, he alleges that the Department failed to make reasonable efforts to return the Child to him. In his fourth issue, the Father claims the trial court erred in ordering him to reimburse the county for the fees owed to his court-appointed attorney because he was entitled to appointed counsel.

If disposition of an issue would result in a rendition of judgment, an appellate court should consider that issue before addressing any issues that would only result in a remand for a new trial. *See Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003); *see also In re K.W.*, 138 S.W.3d 420, 428 (Tex. App.—Fort Worth 2004, pet. denied) (applying this rule in a termination appeal and first addressing legal sufficiency challenges). Accordingly, we will first consider the Father's challenges to the legal sufficiency of the evidence, followed by a review for factual sufficiency.

5

## III. BURDEN OF PROOF AND STANDARD OF REVIEW

Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. While proof by clear and convincing evidence must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *See R.H. v. Tex. Dep't of Family & Protective Servs.*, ____ S.W.3d ____, 2013 WL 1281775, at *5 (Tex. App.—El Paso 2013, no pet.). This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

In our review of termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a

6

firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on a witness's credibility).

## IV. ANALYSIS

### A. Sufficiency of the Evidence to Support Termination

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### 1. Predicate Termination Grounds under Section 161.001(1)

The trial court found three predicate grounds for termination: subsections E, N, and O of section 161.001(1). *See* Tex. Fam. Code §§ 161.001(1)(E), (N) & (O). On appeal, the Father raises a broad issue challenging the legal and factual sufficiency of the evidence. He specifically asserts the Department failed to prove termination was in the Child's best interest, and that the record does not support constructive abandonment, which is described in subsection N. The Father has not specifically challenged the finding under subsection E, which provides a ground

for termination when the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(1)(E). He also did not specifically challenge the finding under subsection O, which provides a ground for termination when the parent failed to comply with a court order establishing the actions necessary for return of the child. *See* Tex. Fam. Code § 161.001(1)(O).

In his reply brief, the Father argues that we should construe his broad issue to encompass a challenge to all the court's termination findings. Rule 38.1(f) of the Rules of Appellate Procedure states that courts will treat the statement of an issue or point "as covering every subsidiary question that is fairly included." Tex. R. App. P. 38.1(f); *see In re M.N.*, 262 S.W.3d 799, 801 (Tex. 2008) (construing complaint that the intermediate court erred in holding mother waived her points for appeal as a challenge to the holding that the trial court could not grant her motion to extend time to file her statement of points on appeal); *see also Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 63 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (construing the father's issue to include a challenge to predicate findings not listed in statement of points).

A court may construe a broadly phrased issue that does not specifically reference any of the trial court's findings when it is clear from the substance of the brief that the appellant is challenging the legal and factual sufficiency of the evidence to support the trial court's determination that the Department established each of the predicate grounds for termination. *In re A.W.*, 2-03-349-CV, 2004 WL 1799893 (Tex. App.—Fort Worth Aug. 12, 2004, no pet.) (mem. op.); *see also Zagorski v. Zagorski*, 116 S.W.3d 309, 315 n. 2 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (rejecting contention that appellant waived her appellate complaint due to the failure of her points to expressly challenge specific findings of fact or conclusions of law because her argument addressed the findings and

conclusions).

Rule 38.1(i) of the Texas Rules of Appellate Procedure provides that a brief must contain clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. Tex. R. App. P. 38.1(i). It is well-established that failure to cite authority or provide substantive analysis waives an issue on appeal. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 410 (Tex. 1997); *King v. Tex. Dep't of Protective & Regulatory Serv.*, No. 08-03-00100-CV, 2004 WL 1505703, at *5 (Tex. App.—El Paso July 2, 2004, no pet.) (mem. op.).

In this case, we may not construe the Father's broadly worded issue to encompass a challenge to all of the trial court's termination findings because the Father made no argument or analysis and cited no authority relevant to the findings under sections E and O. With regard to section O, the Father did not dispute that he did not complete individual therapy required under his service plan, but instead offered an excuse for his non-compliance by blaming the Department for the delay in setting up appointments for his required services. He also did not dispute he failed to pay child support as ordered. The Father testified he did not believe he should have to pay child support, even though he had been determined to be the Child's father. The Father also acknowledged that he had moved into his own apartment shortly before trial, much less time than required by the Department to establish and maintain stable housing for six months.

To succeed on appeal from a termination decree, an appellant must establish that the findings on all of the termination grounds found by the trial court are unsupported by the evidence. *In re A.V.*, 113 S.W.3d at 361 (holding that father's failure to challenge sufficiency of evidence to support finding under one subsection of section 161.001(1) made it unnecessary to address father's challenges to other grounds for termination); *see also In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.— Fort 2003, pet. denied) (holding that because the jury found four grounds for

termination under section 161.001(1) and the father challenged only three of those grounds, appellate court was not required to address his argument that the evidence was insufficient on the three challenged grounds). In *Fletcher,* despite recognizing that issues may be construed broadly, the court ultimately determined it could not address father's issue because he had not properly challenged all predicate grounds. *Fletcher,* 277 S.W.3d at 63.

Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding. *See In re E.C.R.,* 402 S.W.3d 239, 249 (Tex. 2013) (holding parental conduct under subsection O was conclusively established where the parent did not dispute she failed to comply with numerous provisions in court orders specifying compliance was necessary to avoid termination). The record contains evidence supporting subsection O. Therefore, the trial court's finding that appellant failed to comply with subsection O is binding.

The only specific challenge the Father has raised is to an element of section 161.001(1)(N), which provides that a person's parental rights may be terminated if he:

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six months, and:
>
> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam. Code § 161.001(1)(N). In his third issue, the Father alleged the Department failed to make reasonable efforts to return the Child to him. Because

10

the Father raised this specific challenge in his third issue, we will address it in the interest of justice.

A family service plan is designed to reunify a parent with a child who has been removed by the Department. *Liu v. Dep't of Family & Protective Servs.,* 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Implementation of a family service plan by the Department is ordinarily considered a reasonable effort to return a child to its parent. *In re N.R.T.,* 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.); *see also In re M.R.J.M.,* 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (holding that the State made reasonable efforts to return the child to the parent under section 161.001(1)(N) when it prepared several service plans for the parent and made special arrangements for him to attend parenting classes near his home and to transport him to his psychological assessment); *In re K.M.B.,* 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding the State showed that it made reasonable efforts to return the child to the parent when it prepared service plans and made efforts to work with the parent on the service plans).

On February 4, 2013, the Department filed its family service plan for the Father with the court. *See* Tex. Fam. Code. § 263.101 (requiring the Department to file a service plan within 45 days after the trial court appoints the Department as the temporary managing conservator). The Department also filed a status report with the court confirming the Father had received and signed his family service plan. A copy of the plan bearing the Father's signature was admitted in evidence at trial. The Father's service plan detailed the actions the Father was required to complete in order to be reunited with the Child, and it included contact information to schedule appointments for evaluations and classes. In addition, the trial court signed a permanency order after the status hearing adopting the service plan requirements.

Specifically, to be reunited with the Child, the Father was required to:

participate and successfully complete domestic violence classes and will be able to discuss learned behaviors with the caseworker. The Father] may contact [Battering Intervention and Prevention Program] BIPP Client Registrar at 713-224-9911 for an appointment. The fees for these services will be paid by [the Father].

successfully participate and complete anger management classes. [The Father] will provide a certificate of completion to the caseworker no later than 30 days from the last class. [The Father] will be able to demonstrate learned behaviors through actions and or discussions with the caseworker. [The Father] may contact the United Way at 713-957-4357 for providers in their area. [The Father] may also contact Center Point Counseling Services at 713-528-7007, Counsel of Alcohol and Drug Abuse at 713-942-4100 extension 113, Wholistic Counseling Services at 281-403-0838 . . . .

participate in DNA testing to determine if he is the father to the child/children. This testing may be done by National Screening or by the Attorney General. The parent will be notified as to the location for the testing by the court or caseworker.

provide child support while [his] child is in the care of the agency. This child support is to be determined by the court based on minimum wage. This support is to continue while the case is ongoing. Child support may also include the purchase of new clothes, shoes, gifts for the child.

acquire and maintain a working telephone whether it is a residence or cell in order for the caseworker and or service providers to be able to make contact with him. [The Father] will provide the caseworker with updated numbers at all times.

acquire and maintain housing that is stable for more than 6 months. This housing is to be safe, clean and free of hazards to ensure the child's well-being. All the utilities in the home such as electricity, water, and gas must be operational and he must apply basic homemaking skills in his daily chores such as sweeping, dusting, mopping, washing dishes and doing laundry. [The Father] is to provide a copy of the lease agreement or mortgage in his name to the caseworker 10 days after signing this Family Plan of Service. Caseworker will make unannounced home visits to his residence to document progress in this area. [The Father] is to contact the

caseworker by phone or in person within five days of changing residents and provide the change in address.

maintain contact with [the Child] during one hour visits, two times a month at the CPS [Children's Protective Services] office located at 9333 Bryant St Houston, TX 77075; these visits will be scheduled when the parent makes contact with the agency to set up his visits. [The Father] must be on time for each visit. If [the Father] is late 15 minutes or more the visit will be canceled. [The Father] must notify the caseworker 24 hours in advance if not able to make the visit. Canceled visits by [the Father] will not be re-scheduled. Visits will be re-scheduled if [the Child] is sick or have appointments to attend. [The Father] may bring nutritious snacks to the visit.

attend all court hearings, permanency conference meetings and family visits. [The Father] will be responsible for his own transportation to all appointments. [The Father] will maintain contact with [his] caseworker at 9333 Bryant Street Houston, TX 7705 via telephone or in person at least once a week.

participate in parenting classes in person and may not participate via the Internet. [The Father] will attend, participate in, and successfully complete parenting classes and provide the caseworker with a certificate of completion no more than 30 days after the last class date. [The Father] must be able to demonstrate learned behaviors during family visits with [the Child] and through discussions with the caseworker. [The Father] will be responsible for contacting one of the providers listed below. [The Father] must pay any and all fees associated with the parenting classes. DFPS will not pay for these classes. [The Father] must complete the classes within four months of signing the [Family Plan of Service].

submit to random urinalysis drug testing and must test negative at all times. [The Father] will be contacted by the caseworker the morning the UA is to be taken. [The Father] will have until 3 PM of that day to submit to the drug testing. A no show will be taken as a positive drug test. This service will be funded by CPS. Should [the Father] fail to present [himself] for 2 scheduled appointments, [the Father] will be responsible for any fees associated with this service.

participate fully in a drug and alcohol assessment administered by Kinghaven Counseling Group located at 9100 Southwest Freeway Houston, TX (713-457-4372), Turning Point located at 10175 Harwin Dr. Houston, TX (713-773-3280). [The Father] will follow all the

13

recommendations including inpatient and or outpatient drug treatment, individual, group and or family therapy, and or random urine analysis. [The Father] will be contacted by the services provider to schedule the appointment. If after 2 weeks from the date the referral was submitted and the provider has not contacted [the Father] then [the Father] should contact the provider to schedule the appointment. The evaluation is to be completed by 02/28/2013.

participate fully in a psycho-social assessment to address his emotional or mental needs. The assessment may be administered by Newsom Psychological located at 2626 South Loop West, Suite #181, Houston TX (855-640-1700). [The Father] will be contacted by the service provider to schedule the appointment. If after 2 weeks from the date the referral was submitted the provider has not contacted [the Father], he should contact the provider to schedule the appointment. The fee associated with this service will be paid for by the agency. If [the Father] misses two (2) scheduled appointments, he will then be responsible for any fees associated with this service. The evaluation is to be completed by 02/28/2013. [The Father] will follow all recommendations from the evaluation that may include a psychological and or psychiatric evaluation, individual therapy, family therapy, and or group therapy.

The Department filed a progress report with the court on May 7, 2013. The report does not reflect that the Father had completed any of the required tasks, and it repeated the above list of required tasks. The deadline for completing the required evaluations was extended to July 1, 2013. On June 23, 2013, the trial court conducted a permanency hearing. In the order signed June 27, 2013, the court again expressly approved and adopted the service plan as set out in the permanency progress report, specifying the actions the Father must perform to regain custody of the Child. On September 11, 2013, the Department filed another progress report, which again did not reflect the Father had completed any of the required tasks. The Department's next progress report was filed November 7, 2013, and the report again provided notice that the Father had not completed his service requirements.

On appeal, the Father complains that the record does not show that the

14

Department's caseworker went over the service plan with him, pointing out that the caseworker signed the plan before the date of the Father's signature. The record does not show that the Father made this complaint in the court below, and he has waived it. *See* Tex. R. App. P. 33.1(a). Moreover, the record does not support this contention. Not only does the record reflect the Father signed the plan, it appears that the caseworker discussed aspects of the plan with the Father based on the recitations in the plan. The plan recited that the Father "hopes to have [the Child] placed back under his care and raise her. [The Father] wishes the best for her, and to provide her with the best support so that she can become whatever she wants to be later in life. [The Father] also said that he wishes that she grows up being a positive person in life." In his trial testimony, the Father acknowledged that he had contact with the Department caseworker when he signed his service plan.

The Father also asserts that the Department's delay in scheduling his services resulted in his inability to complete the required individual therapy before trial. The record reflects caseworker Dana Lora Charles provided the Father the information to schedule his psychosocial evaluation in October of 2013. After first completing a questionnaire, the Father submitted it to the counselor a few weeks later and met with the counselor on November 13, 2013. The counselor's report, which recommended additional individual therapy, was filed December 11, 2013, the day before the first trial setting. The Father complains on appeal that the previous caseworker, Daisy Cantu, did not schedule his appointments or return his calls. The Father acknowledged at trial that at some point after he signed his service plan, he lost contact with Cantu. He admitted that he was not "working" on his services during that time. He stated Cantu did not set up these services, but he did not ask her to. The Father agreed that after Cantu was replaced by Charles as caseworker, Charles returned his calls, helped him set up visitation with the Child, and gave him a phone number to set up his psychosocial evaluation.

15

The Father's service plan provided detailed contact information to arrange for completion of the required services. The Father acknowledged he did not alert the trial court that he was unable to schedule these services without the Department's assistance. The Father signed his service plan on February 5, 2013, and trial did not commence until January 23, 2014. The record clearly demonstrates the Father had almost a full year to complete his required services, and he did not start the process until close to trial. *Cf. In re A.Q.W.*, 395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.) (holding the evidence was insufficient to support a finding the Department made reasonable efforts to return child to father where he received Department's service plan 34 days before the termination hearing and father did not have a reasonable opportunity to complete any requirements of the service plan due to his incarceration).

The Father cites *In re K.G.*, 350 S.W.3d 338 (Tex. App.—Fort Worth 2011, pet. denied). In *K.G.,* the court held the evidence was legally and factually sufficient to establish that the Department made reasonable efforts to return the child to the mother, as required for termination of the mother's parental rights based on constructive abandonment. *Id.* at 354. The caseworker testified that she had tried to facilitate reunification by providing services to the mother, encouraging the mother to seek help for her mental health problems, and making efforts to ensure that the mother and child had good visits. *Id*. This case likewise has evidence that caseworker Charles assisted the Father by arranging for his services and arranging visits with the Child. Although the Father alleged at trial that his first caseworker did not return his calls, the record contains no evidence the Father brought any complaints before trial about the lack of assistance from his previous caseworker. In addition, when the service plan was first implemented in February of 2013, the Department provided very detailed information in the service plan to facilitate the Father's ability to complete his services. The record

demonstrated that the Father was intelligent and well-educated. The factfinder could reasonably have determined the Father had the ability to schedule services, even without additional assistance from a caseworker.

Reviewing all the evidence in the light most favorable to the termination findings under subsection N, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the finding that the Department made reasonable efforts to return the Child to him. *See In re M.R.J.M.*, 280 S.W.3d at 505. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding that the Department made reasonable efforts to return the Child is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of this termination finding. *See In re H.R.M.*, 209 S.W.3d at 108. We overrule the Father's third issue.

**2. Best Interest under Section 161.001(2)**

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a).

The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's

family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. Tex. Fam. Code § 263.307(b); *R.R.,* 209 S.W.3d at 116.

In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best interest finding, a court examines several factors, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of the factors to support a finding terminating a parent's rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

### a. The Child's Needs and Desires

The Child was only slightly over one year old when trial began. Because of her young age, the Child was completely dependent on her caregiver. The Father acknowledged that he has not paid child support during the pendency of these proceedings. There was evidence that the Father provided some support for the Child by bringing formula, diapers, and wipes to one visit.

The Child was also unable to communicate her desires because of her young age. When children are too young to articulate their wishes, courts may consider their bond with the parents and foster parents. *See E.F. v. Tex. Dep't Family &*

*Protective Servs.,* No. 03-11-00325-CV, 2011 WL 6938496, at *3 (Tex. App.—Austin Dec. 30, 2011, no pet.) (mem. op.).

The Grandmother testified that the Child has bonded with the foster parents. The record reflects the Father had not bonded with the Child. The Father testified about his visits with the Child, acknowledging that he was "required to visit two hours within a month" and he had "been doing what they required." He testified he had been visiting the Child "since the beginning" of these proceedings, but then acknowledged the Child, who was taken into the Department's custody a few days after her birth, was "a few months old" when he first visited her. The Father almost never identified the Child by her name, but instead referred to her as "the kid." Caseworker Charles testified that the Father had a total of four or five visits with the Child during the over one-year period that she was in the Department's care, and only two of those visits were before trial. She testified that she observed the Father's visits with the Child. At the first visit, the child tried to walk away from the Father. She described the Child as "fussy" and "crying reaching out for [her] to take her away" for the first ten to fifteen minutes of each visit. She acknowledged on cross-examination that the Child later played with the Father. Charles testified that the Father did not comply with the foster parent's written request that he feed the Child during one two-hour visit. At the Father's most recent visit during trial, the Child was fussy and cried for an hour and a half, and the Father then fed her. She testified to her belief that the Child does not know the Father. Charles also testified she found it odd that the Father wore glasses with dark lenses during his visits. The Father later explained that he wore the glasses because he had an unspecified medical condition. The Father testified that he had inquired about what size clothing the Child wore, but he did not ask how much she weighed. He explained that the diapers he purchased for her that were the incorrect size were based on her age, according to the package. He acknowledged he does not know

19

what the Child eats on a daily basis and has not asked.

This evidence showing the Child has not bonded with the Father supports the court's best-interest finding.

### b. Endangerment, Including Criminal History and Drug Use

The unchallenged predicate findings under section 161.001(1)(E), endangering conduct, are binding and may be considered as evidence related to the court's best interest finding. *See In re K.L.G.*, No. 14-09-00403-CV, 2009 WL 3295018, at *2 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (mem. op.) (because the predicate and best interest findings were not challenged, they were binding on the appellate court); *see also In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding that the same evidence may be probative of both section 161.001(1) predicate grounds and best interest).

Not only is the finding that the Father engaged in endangering conduct or knowingly left the Child with persons who engaged in endangering conduct unchallenged, the record contains ample evidence of this ground that the trial court could reasonably have considered in making its best interest determination. The Father's criminal records were admitted at trial, and these included several violent offenses. *See Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (holding that a parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child); *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.) (recognizing that a fact-finder may infer from past endangering conduct that similar conduct will recur if the child is returned to the parent).

In 1997, the Father pled no contest to a misdemeanor assault charge alleging domestic violence, and he was placed on deferred adjudication probation. The victim of this offense was not identified, but it was not asserted that the assault was

against the Mother. One of the terms of the Father's probation required that he attend anger management classes.

On May 20, 2007, the Father was convicted of misdemeanor assault against the Mother, and he was again placed on deferred adjudication probation. The Father was charged a second time with assaulting the Mother in November 2007, and the record contains an order prohibiting him from having any contact with the Mother as a condition of his bail. The plea documents in the record show the Father pled guilty to assaulting the Mother by choking her until she lost consciousness and punching her in the head several times. The record reflects that the Mother gave birth to the Brother about four months after the assault. On February 1, 2010, the Father was sentenced to 180 days in jail for the November 2007 assault. As part of his plea bargain, the State agreed to reduce the charge from a third degree felony to a Class A misdemeanor, and it abandoned the enhancement.

On April 11, 2012, the Father was charged as a second offender with assaulting the Mother. The Mother's complaint stated the Father grabbed her face so hard that it caused her to bite her tongue and he struck her in the head with his fist with such force that it left a bruise on the right side of her forehead. The Father introduced in evidence an order signed August 29, 2013, dismissing the 2012 case with a notation that the Father had "completed BIPP," which is the Battering Intervention and Prevention Program.

The Grandmother also testified about acts of violence that the Father committed against her daughter. She first observed the Mother with bruises and a black eye in 2007. The Mother indicated to her that the Father caused the injuries. Later in 2007, when the Mother was pregnant with the Brother, the Mother was hospitalized when her intestines ruptured. The Grandmother testified her daughter told her the Father sexually assaulted her with an object, causing the injuries.

21

When questioned about this incident at trial, the Father invoked his Fifth Amendment right not to answer.[4] The Grandmother also observed bruising on the Mother's neck and a cut across her face that her daughter told her had been caused by the Father. In addition, the Grandmother testified to her daughter's head injury from a vehicle accident, which she claimed was caused when the Father tried to run the Mother off the road. Caseworker Charles testified the Mother told her she did not want the Child to be with the Father because of all the physical violence in the parents' relationship. Despite this evidence, the Father denied he "beat" the Mother.

The Grandmother testified her daughter suffered from depression and was bipolar. She was aware that the Mother drank heavily. The Grandmother also described her daughter's drug use, stating the Mother used methamphetamines and party drugs. The Grandmother believed her daughter had been a chronic drug user since 2006.

The Father denied knowing the Mother used drugs or that she was described as a "chronic" drug user. Although the Father denied recreational drug use, the Grandmother testified that her daughter told her she often did drugs with the Father, including when she was pregnant with the Child. The Father later acknowledged that he knew the Mother used drugs and he knew drug use during pregnancy endangers a child. The record contains the Father's drug test report dated January 15, 2014, which was negative for ingestion of narcotics during the previous ninety days. The Father testified that he had completed a "drug assessment" as part of his services, and the drug counselor told him she would notify the caseworker. He stated it was his understanding that the counselor would

---

[4] In a civil case, the factfinder may draw an adverse inference with respect to a party's claim of the privilege against self-incrimination. *See* Tex. R. Evid. 513(c); *Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393, 404 (Tex. App.—El Paso 2004, no pet.).

advise the caseworker whether or not it would be necessary for him to take a drug test. The Father later acknowledged that he was aware the court had ordered a drug test on the first court date, and he did not submit to testing at that time. He explained that he had only a half day off from work that day and it was too late for him to stay and undergo testing.

The Father's repeated acts of violence, primarily against the Child's Mother, support a finding that termination of the Father's parental rights is in the best interest of the Child. The trial court reasonably could have considered that the Father's repeated acts of violence would continue in the future. *See Walker v. Tex. Dep't Family & Protective Servs.,* 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Caseworker Charles also testified that the Father had not demonstrated an ability to be protective of the Child.

In addition, the evidence that the Father joined the Mother in her drug use, even while she was pregnant, supports a finding that termination is in the Child's best interest. A parent's drug use supports a finding that termination is in the best interest of the child. *See In re M.R.,* 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). Parental drug use during pregnancy weighs against the parent in the best interests analysis. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.,* 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.). The Father acknowledged he was aware the Mother used drugs during her pregnancy and he took no steps to protect the unborn child. The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C.,* 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.).

### c. Failure to Comply with Service Plan and Reasons for the Failure

As noted above, the Father has not challenged the finding that he failed to comply with his service plan, and that finding is binding. *See In re K.L.G.,* No. 14-

09-00403-CV, 2009 WL 3295018, at *2. The failure to comply with a service plan can support the trial court's best-interest finding. *In re E.C.R.*, 402 S.W.3d at 249. In connection with this factor, we also may consider the Father's willingness and ability to seek out, accept, and complete counseling services and to effect positive changes. *See* Tex. Fam. Code § 263.307(b).

We first consider the report of the Father's psychosocial assessment that was admitted in evidence. The Father did not submit to the assessment until the case had been on file for almost a year. Before attending the session with the counselor, Thomas Whitehead, the Father completed a questionnaire, and he acknowledged he did not return the questionnaire for several weeks. In response to a question about how he became involved with Children's Protective Services (CPS), the Father answered with question marks, suggesting he had no idea. In his report, Whitehead noted that the Father "appeared to be minimizing his role in the CPS case" and "playing dumb." The Father answered all questions about his parenting "in an unrealistically positive manner," presenting himself as the "perfect" parent. The evaluator assessed that the Father had a pattern of "talking the talk," without necessarily "walking the walk." Whitehead opined that the Father "may tend to focus on appearances more than consistently following through with requirements."

The Father acknowledged in his psychosocial evaluation that he had a conviction for assault. The Father denied to the counselor that he knew the Mother used drugs, and stated he first learned about her drug use when the Child was born and both the Mother and Child tested positive for drugs. He claimed that he did not know until the Child's birth that the Mother had also tested positive when the Brother was born. Contradicting his previous denial of knowledge of the Mother's drug use, he explained the assault conviction by stating that his "girlfriend is histrionic, and she was doing drugs." When questioned about whether he had been

24

incarcerated, he acknowledged he was in jail for about five months for a domestic violence conviction. The Father explained that he did not hit the Mother and the case was based on false allegations. He did not admit that there had been a series of convictions.

Whitehead, the counselor, recommended the following for the Father: "referral to a domestic violence class, cautions concerning possible manipulation, and referral for goal directed individual counseling." It is undisputed the Father did not complete individual counseling as recommended in his psychosocial evaluation. Caseworker Charles testified on December 12, 2013, that the Father had that day provided her documents to show completion of services, with the exception of his individual therapy. She had not been able to verify completion of the required services with the providers, however. At trial, Charles confirmed that the Father provided documentation that he had completed the domestic violence program, BIPP, and an anger management class. She also confirmed he had completed a parenting class and a drug assessment. Charles was unable to confirm the Father's housing situation because the phone number on the copy of the apartment lease that the Father provided was incorrect. The Father also admitted he had not supported the Child during the pendency of this case other than to provide formula, diapers, and wipes at one of his visits. The Father admitted he had spent over $30,000 in attorney's fees in criminal cases.

The Father primarily exercised his visitation rights when the trial date was near. Caseworker Charles testified that before the trial commenced, the Father had only two visits with the Child, and he did not request a visit until she had been on the case for three months, which was in November of 2013. She stated there was no evidence in her records that the Father had been prevented from seeing the Child. The Father argued that his failure to make regular visits and maintain significant contacts with the Child was the Department's fault for failing to

schedule the visits. The Father's service plan expressly provided, however, that his visits with the Child were to "be scheduled when the parent makes contact with the agency to set up his visits."

The Father blamed his early failure to visit the Child and late compliance with his service plan on the first caseworker, Cantu, who is no longer employed by the Department. He complained that she did not return his calls and did not make arrangements for his classes, evaluations, or visits. He acknowledged that he never brought up the caseworker's alleged non-responsiveness at hearings in January, February, or June, before a new caseworker was assigned in August 2013. He asserted his appointed counsel brought the matter up once, but he did not know the date. The Father had no complaints about the new caseworker, Charles. Charles explained that she attempted to contact the Father to assist him in completing his services in August when she was first assigned the case. The phone number for the Father in the Department's system was not his current number and she did not obtain the correct number until October. The Father's service plan required him to "provide the caseworker with updated numbers at all times."

The Father did not present any evidence to demonstrate he had learned from his services how to control his violent behavior. The Father attended the Batterers Intervention Prevention Program (BIPP) once a week for eighteen weeks. When asked the reason, he stated, "because it was part of my Service Plan." He later acknowledged his attendance at BIPP was also a requirement imposed by the criminal court. However, despite the eighteen-week class, the Father could not articulate any behavior, character trait, or pattern that led him to violent behavior. When asked what his triggers were that led to domestic violence, the Father made reference to his "emotions" without further explanation. When asked to explain, he answered, "Well if we were talking — if we were referencing the will then it's the same people react to emotions. So it will be no different from anybody reacting to

certain emotions like if you are happy you smile. You giggle or laugh. Those kind of triggers." Further inquiry produced no clarification.

The Father testified he attended a domestic violence class both because of the recent assault charge and also because of his service plan. He also testified he completed a parenting class. The Father's partial, or even substantial, compliance with service requirements set out in a court order is not enough to avoid a termination finding. *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In sum, the factfinder could have reasonably determined the evidence supports a finding that the Father was not willing to seek out, accept, and complete counseling services and to effect positive changes to his behavior, and that termination is in the Child's best interest.

### d. Parenting Abilities, including Other Children

The record demonstrated that the Father was intelligent. Whitehead, the counselor, noted that the Father's strengths were his above-average intelligence, stable employment, and his stated desire to fulfill his parental obligations to the Child. The Father stated in his evaluation that he has a bachelor's degree in mechanical engineering. He stated he had been employed full time as an engineer by the same company for about three years. Whitehead acknowledged that the Father was more intelligent than many of the parents he evaluates for CPS, and he appeared to know more about parenting than the average CPS client.

The Father never made an effort to learn about his Child's diet and feeding regimen and he did not learn her diaper size until trial. There was no evidence of his ability to care for the Child. Caseworker Charles testified the Father had not demonstrated an ability to properly parent the Child.

The Father's rights to the Mother's five-year old son, the Brother, were

terminated. He acknowledged he had received the termination documents, but he did not appear at the termination proceedings or otherwise contest the termination. He later admitted he did not read the documents. The Father claimed at trial that he sought to have DNA testing done to confirm his parentage to the Brother, but the Grandparents never responded to his request. The Grandmother denied that the Father ever asked to have DNA testing done. The Father acknowledged he never provided any support for the Brother. The record showed the Father assaulted the Mother when she was pregnant with the Brother. When asked why he never helped the Grandparents with the Brother, he replied, "I haven't had a DNA test of my five-year-old child." The Father admitted in his interview with the counselor that he is the father of the Mother's five-year old son. He told the counselor the Brother lived with his grandparents and denied that there was a previous CPS case. He also acknowledged his parentage of the Brother several times during these termination proceedings. The Father had not seen the Brother since "early going of the kid." He did not know the Grandparents had raised the Brother since shortly after his birth or that the Brother and the Child had a relationship.

The Grandmother testified that she and her husband contacted CPS about the Mother's neglect of the Brother, leading to the termination proceedings. The Grandmother had raised the Brother since shortly after his birth. She rushed to the hospital after the Child was born and the Mother notified her CPS planned to take custody. She testified none of the Father's family came forward seeking to care for the Child. The Grandmother had attended every hearing in this case.

The Grandmother also testified that the Mother again became pregnant after the Brother's birth, and the Father asked her to terminate that pregnancy. The Mother was pregnant again during these proceedings, and the Father acknowledged that it was possible he was the biological father of the unborn child. He expressed little interest, but stated he would pursue custody "after the DNA test."

### e. Plans for the Child and Support Systems

The Father described few definite plans or preparations for taking custody of the Child. The Father had not shown the Department that any family support was available to him until the trial, and the Department had not had an opportunity to interact with the Father's family. Even during trial, when asked about his support system, the Father answered, "there's no need I can — I got the means to do it on my own." The Father then testified that if the need arose, his two sisters would help him if he were awarded custody of the Child. One sister had two children, and the Father testified that if he were granted custody he would get advice from that sister, and she could take care of the Child while he was at work. He testified that he had a car seat for the Child. The Father also testified that he had his own two-bedroom apartment and could get a crib and other items for the Child from his sister.

His other sister (the Aunt) lived with his parents and cared for his disabled mother. She had no children. She had no contact with the Child or the Brother. There was evidence the Aunt also has violent tendencies. On April 10, 2013, police responded to a family violence report at the Father's family residence.[5] The Father's mother told police that her daughter, the Aunt, hit her with a metal pipe on the left side of her body and she was afraid of further attacks. The officer observed bruising, and filed a charge of assault on a family member against the Aunt. The assault charge against the Aunt was later dismissed. At trial, the Aunt denied the assault. The Father claimed that he was not aware of the assault. He acknowledged, however, that he knew there had been a criminal case.

The Grandmother testified at the December hearing that she was entering the

---

[5] At trial, the Father testified that he lived with his mother, father and sister. He then said he moved out of that home in November of 2013. He later acknowledged that the house was jointly held in his and his parents' names.

case to ensure the Child has a safe environment. Her goal in intervening in the case was to prevent the Father from obtaining custody. She testified that after the previous termination proceeding, she adopted the Brother, who was born to her daughter and the Father. The Grandmother testified that in her opinion both parents' rights to the Child should be terminated.

The Grandmother reported that the Child's foster parents were very supportive of her and her husband's efforts to establish a relationship with the Child. They have met many times at each other's homes. The Grandparents and the foster parents believe it is important for the Child to have a relationship with her Brother. If the foster parents were not granted custody of the Child, the Grandmother and her husband requested custody. She testified she would maintain a relationship with the caregivers, and that the Child would be able to continue her relationship with her Brother.

In sum, the record contains sufficient evidence to support the best interest finding based on the Father's criminal history of domestic violence, his failure to fully comply with the court-ordered services for reunification, his continued relationship with the drug-using Mother, his limited interactions with the Child, and his failure to support her or bond with her. Viewing all the evidence in the light most favorable to the judgment, we conclude that a fact finder could have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the best-interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Father's parental rights is in the Child's best interest. *See In re H.R.M.*, 209 S.W.3d at 108. Based on the numerous inconsistencies in the Father's testimony, the factfinder was entitled to discredit the Father's self-serving statements that he did not assault

the Mother, he did not use drugs, and he was not aware the Mother used drugs. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the Child's best interest. Therefore, we overrule the Father's second issue.

## B. Motion for New Trial

In his first issue, the Father argues the trial court erred in denying his motion for new trial, in which he alleged ineffective assistance of counsel, improper dismissal of his appointed counsel, and abuse of discretion in denying his motion for continuance.[6] The Father first asserts his appointed counsel was wrongfully released, claiming he was indigent and entitled to appointed counsel. The Father claims his appointed counsel failed to conduct discovery during the eight moths she represented him, rendering ineffective assistance of counsel. After the allegedly improper release of his appointed counsel, the Father claims it was too late for his new counsel to conduct discovery, depriving him of a fair trial. He also claims the trial court denied his requests for a continuance. We first address whether the Father's appointed counsel was improperly dismissed.

## 1. Appointed Counsel

Texas has adopted a statutory scheme for providing counsel to assist indigent parents, mandating the appointment of an attorney ad litem for an *indigent* parent who opposes the termination of the parent-child relationship in a suit filed by a governmental entity. Tex. Fam. Code § 107.013(a)(1) (emphasis supplied); *see In re E.A.F.*, 424 S.W.3d 742, 747 (Tex. App.—Houston [14th Dist.] 2014, pet.

---

[6] The Father also alleged in his motion for new trial that the six-month extension of the dismissal deadline was unlawfully granted outside section 263.401. *See* Tex. Fam. Code § 263.401 (permitting retention of case beyond one-year anniversary of the Department's conservatorship if the court finds extraordinary circumstances necessitate that the child remain in the Department's temporary custody). He has not carried this complaint forward on appeal.

filed). Specifically, the Family Code provides that in suits filed by a governmental entity the trial court "shall appoint an attorney ad litem to represent the interests of: (1) an *indigent* parent of the child who responds in opposition to the termination . . . ." Tex. Fam. Code Ann. § 107.013(a)(1) (emphasis supplied); *see also In re C.D.S.*, 172 S.W.3d 179, 186 (Tex. App.—Fort Worth 2005, no pet.) (holding the trial court was required to appoint an attorney ad litem to represent an indigent parent in a government-initiated termination proceeding, and the failure to do so constituted reversible error).

The appointment of an attorney ad litem is required whether or not the indigent parent requests an attorney. *See In re J.M.*, 361 S.W.3d 734, 739 (Tex. App.—Amarillo 2012, no pet.) (holding the trial court committed reversible error by proceeding without appointing an attorney ad litem, even though indigent mother did not request an attorney). A parent's filing of an affidavit of indigency "trigger[s] the process for mandatory appointment of an attorney ad litem." *In re V.L.B.*, ___ S.W.3d ____, No. 01-14-00201-CV, 2014 WL 4373567, at * 3 (Tex. App.—Houston [1st Dist.] Sept. 4, 2014, no pet. h.) (quoting *In re K.L.L.H.*, No. 06-09-00067-CV, 2010 WL 87043, at *5 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.)). After a parent has filed an affidavit of indigence, the court may, but is not required to, conduct a hearing to determine whether the parent is indigent. *See* Tex. Fam. Code § 263.061(b).

On February 14, 2013, the Father completed a pre-printed form "Indigency Affidavit," in which he asked the court to appoint an attorney to represent him in the termination proceeding. The Father acknowledged in the affidavit that he was employed as an engineer and worked 40 hours per week. He left blank the space for his hourly, weekly, or monthly salary. He acknowledged that he had received a paycheck in the amount of $998 the week before and expected to receive another paycheck the next day. The form does not identify whether the $998 amount was

gross or net, weekly or monthly. The Father swore that he paid $700 per month in "rent/house payment." He also stated he had about $500 in his checking account, and he owned a 1998 automobile with a fair market value of $2,500. He also modified the form to include a payment of $2,500 per month in legal fees. No reporter's record of a hearing to determine indigence is included in our record.

The parties agree that the trial court appointed counsel to represent appellant shortly thereafter. Months later, on October 3, 2013, while testifying at a status hearing, the Father acknowledged his salary was $70,000 per year and that his net monthly salary was about $3,500. He acknowledged that he paid no rent and had been living with his sister since January, before the affidavit of indigence was signed. He did not claim that he continued to pay $2,500 monthly in legal fees, as his criminal case had been dismissed after completion of BIPP. He confirmed he had no debts and was not "poor."

The Department then requested that the court remove appointed counsel because the Father is not indigent. The court informed the Father "your testimony, sir, does not match your Affidavit. Your Affidavit shows that you make less than half of what you just testified that you earn."[7] The court then found that the Father is not indigent. The court granted appointed counsel's request to be excused. The trial court informed appellant that he represented himself until he hired an attorney, and the court strongly recommended that the Father hire an attorney before the trial setting on December 12, 2013.

The Father argues on appeal that the record does not rebut the presumption that he remained indigent throughout the proceedings. We disagree. *See In re P.E.*, No. 05-12-00944-CV, 2012 WL 5378250, at * 2 (Tex. App.—Dallas Nov. 1, 2012,

---

[7] The trial court's statement indicates that court had considered the $998 paycheck shown on the Father's affidavit as covering a two-week pay period, when he apparently was paid weekly.

no pet.) (mem. op.) (finding no abuse of discretion in trial court's order sustaining contest to indigence based on discrepancies between the father's affidavit and his testimony). The Father's testimony is sufficient for the trial court to have determined he was not indigent.

The Father also frames his complaint as an allegation that the trial court abused its discretion by "the forced discharge of counsel." The record reflects that the court did not "discharge" appointed counsel, but rather, the court reconsidered the Father's claim of indigence. The Father also complains there is no written motion for the removal of appointed counsel, but he has cited no authority that a written motion is required under the facts presented here. The Department's oral request was sufficient. *See* Tex. Fam. Code § 107.013(e) (permitting the court to reconsider indigence "on the motion of the parent, the attorney ad litem for the parent, or the attorney representing the governmental entity"); *cf.* Tex. R. Civ. P. 12 (requiring "sworn, written motion" to show authority).

We review the trial court's determination of indigency in a parental termination case under an abuse of discretion standard. *In re C.D.S*., 172 S.W.3d 179, 184 (Tex. App.—Fort Worth 2005, no pet.). We will conclude the trial court abused its discretion if it acted without reference to any guiding rules or principles or in an arbitrary and unreasonable manner. *Id.* (citing *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 242 (Tex. 1985)). As the fact-finder, the trial court is the sole judge of the credibility of the witnesses and evidence. *In re A.R*., 236 S.W.3d 460, 471 (Tex. App.—Dallas 2007, no pet.). We may not reverse the trial court's decision simply because we might have reached a different result. *See Downer*, 701 S.W.2d at 242.

Generally, the test for indigency requires the claimant to prove, by a preponderance of the evidence, that he would be unable to pay the costs if he really wanted and made a good faith effort to do so. *Few v. Few*, 271 S.W.3d 341, 345

(Tex. App.—El Paso 2008, pet. denied). Family Code Section 107.013 does not define "indigent." One court has defined "indigent" in section 107.013(a)(1) as "a person who does not have the resources, nor is able to obtain the resources, to hire and retain an attorney for representation in the termination case." *See In re C.D.S.*, 172 S.W.3d at 185. The burden of proof rests on the individual seeking to establish indigent status to prove that he could not pay attorney's fees or costs associated with the suit. *In re D.L.W.*, No. 14-04-00703-CV, 2005 WL 486613, at *1 (Tex. App.—Houston [14th Dist.] Mar. 3, 2005, no pet.) (mem. op.) (holding appellant did not meet her burden to establish she was entitled to appointed counsel in a termination proceeding, citing *Allred v. Lowry,* 597 S.W.2d 353, 355 (Tex. 1980)).

In making an indigence determination, the court can consider the purported indigent's income, source of income, assets, property owned, outstanding obligations, necessary expenses, number and ages of dependents, and spousal income available to the defendant. *In re C.D.S.,* 172 S.W.3d at 185. Here, the trial court heard and considered evidence through the Father's own testimony that the Father makes over $70,000 per year and has no debts. While the Father asserts he completed the affidavit truthfully, it is less than clear and is arguably misleading. The only expenses shown on the affidavit were the payments to an attorney and a monthly rent expense that appellant later acknowledged he did not pay. The Father provided no testimony or supporting documentation.[8]

The Family Code provides that the appointed attorney ad litem's duties

_____

[8] The record reflects the Father was ordered to provide additional information about his financial status at the beginning of the case. In the emergency order awarding temporary custody of the Child to the Department, the court ordered the Father to "furnish to the Department and the Court information sufficient to accurately identify [his] net resources and ability to pay child support along with copies of income tax returns for the past two years, any financial statements, bank statements, and current pay stubs, pursuant to Rule 196, Texas Rules of Civil Procedure and § 154.063, Texas Family Code." There is no indication in the record that the Father complied with this order.

continue until the termination proceedings are dismissed or finally concluded unless the attorney is relieved or replaced "after a finding of good cause is rendered by the court on the record." Tex. Fam. Code § 107.016(2). Based on the evidence recited above, the court determined the Father was not indigent and therefore was not entitled to appointed counsel. The trial court made findings on the record showing good cause to remove the appointed attorney ad litem. Therefore, the court complied with section 107.016(2).

There is no written order removing counsel; the court granted appointed counsel's request to be excused at the conclusion of the October 3, 2013, hearing. The court advised the Father that trial was scheduled in December, and strongly recommended the Father retain counsel before trial. The Father could have made arrangements to retain the same counsel, which he claimed he attempted to do. In his affidavit supporting his motion for new trial, the Father stated that he spoke with Solis immediately after she was released about remaining on the case as his retained attorney. She instructed him to call her office, which he stated in the affidavit he did. Although the Father stated he left messages, he did not hear back from Solis. He asserted that he saved money for a new attorney's retainer and was able to find an attorney he could afford in early December. The Father's retained attorney, Rushing, appeared at the December trial setting. Our record contains no request for a continuance. Nonetheless, trial was postponed until January 27, 2014. At the beginning of trial on January 27, 2014, new retained counsel, Acosta and Pons, appeared for the Father, and our record contains no explanation for the Father's decision to change attorneys. Trial began briefly but was continued for another month. On the record before us, the Father has not established that the trial court's decision denying his entitlement to an appointed attorney ad litem prejudiced his ability to prepare for trial. We hold the trial court did not abuse its discretion.

36

## 2. Ineffective Assistance of Counsel

As part of his first issue, the Father asserts his appointed counsel provided ineffective assistance. The Father's motion for new trial was supported by the Father's affidavit in which he stated he learned Solis would no longer represent him at the October 3, 2013, hearing. He alleged he was not told Solis had not requested discovery. He further stated, "Had I known that I was up against such a tight deadline, I would have asked the judge for more time, I also would have had [*sic*] made every effort to have obtained a lawyer so that my new lawyer would have been able to request discovery."

The statutory right to counsel in parental rights termination cases includes a guarantee that counsel will perform effectively. *In re B.G.*, 317 S.W.3d 250, 253–54 (Tex. 2010). In parental rights termination cases, the Supreme Court of Texas has adopted the *Strickland* test that establishes the standards for effective assistance in criminal cases. *See In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 74 (1984)). Under the well-established *Strickland* test, proving ineffective assistance of counsel requires a showing that (1) counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006).

In adopting the *Strickland* test for parental termination cases, the Supreme Court of Texas explained that courts must primarily focus on whether counsel performed in a reasonably effective manner. *In re M.S.,* 115 S.W.3d at 545. Reviewing courts must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions

are strategic. *Id*. An appellant bears the burden to overcome this presumption. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. When the record is silent concerning the reasons for trial counsel's actions, we do not engage in speculation to find ineffective assistance of counsel. *Walker*, 312 S.W.3d at 623 (citing *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.)). Accordingly, ineffective assistance claims must be firmly found in the record, and the record must affirmatively show the alleged ineffectiveness. *Walker*, 312 S.W.3d at 622–23; *see also In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.). Challenged conduct constitutes ineffective assistance only when it is "so outrageous that no competent attorney would have engaged in it." *In re H.R.M.*, 209 S.W.3d at 111 (citing *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Under the second prong of the *Strickland* test, an appellant must establish that there is a reasonable probability that but for his attorney's deficient performance, the outcome of his case would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *In re M.S.,* 115 S.W.3d at 550. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). If the *Strickland* test is not met, an appellant's ineffective assistance of counsel claim is defeated. *See In re M.S.*, 115 S.W.3d at 545; *see also Strickland*, 466 U.S. at 700, 104 S.Ct. 2052.

In this case, the Father complains that his appointed counsel failed to conduct discovery to determine the status of his compliance with his service plan. The Father asserts that he was harmed by the lack of discovery because he was not aware he had not complied with the terms of his service plan, and the failure to conduct discovery was "structural" error amounting to a complete denial of

counsel.[9] "Structural" errors are federal constitutional errors so labeled by the United States Supreme Court. *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997). The total deprivation of counsel to an indigent defendant at trial is structural error. *Johnson v. U.S.,* 520 U.S. 461, 468–69, 117 S.Ct. 1544, (1997) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792 (1963)).

In support of his argument, the Father cites *Johnson v. State,* 169 S.W.3d 223, 231–32 (Tex. Crim. App. 2005), addressing counsel's violation of a defendant's right to testify. Automatic reversal without a harm analysis applies only when the trial court has committed structural error. *Id.* at 232. If the complained of deprivation is caused by defense counsel, the *Strickland* analysis applies. *Id.*

Here, the Father was not deprived of counsel. He was represented by two lawyers at trial, and the record reflects these lawyers actively participated in the trial, making appropriate objections and examining witnesses. The failure to conduct discovery is not structural error, and courts have found that the failure may be trial strategy, absent proof to the contrary. *See, e.g., Martin v. State,* 265 S.W.3d 435, 441 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (stating counsel may have failed to request breath test results as strategy to allow the jury to believe the State had "conveniently lost" exculpatory evidence). In criminal cases, the failure to investigate will require reversal only if the accused's only viable defense was not advanced and there is a reasonable probability that but for this failure, the result would have been different. *Id.*

The Father has not alleged how any discovery would have changed the evidence presented at trial. *See In re K.M.H.*, 181 S.W.3d 1, 9 (Tex. App.—

---

[9] The Father cites *Olguin v. Jungman,* 931 S.W.2d 607, 611 (Tex. App.—San Antonio 1996, no writ), a probate case addressing failure to disqualify a trustee from serving as the independent executor. *Olguin* has no application to the issues here.

Houston [14th Dist.] 2005, no pet.) (rejecting ineffective assistance issue where there was no showing in the record that discovery directed to CPS would have factually changed any of the proof at trial). The record demonstrates that the Father had ample means available to determine what actions were required to comply with the service plan. The Father was aware of the plan's requirements; he signed the plan on February 5, 2013. The plan had detailed information about scheduling services. The plan expressly provides: "For information about the Family Service Plan or your child(ren), please contact:" the case worker, whose name and phone number were provided in the plan. The Father was present at regular status hearings at which his progress in completing the requirements of his service plan was discussed. The Father did not complain to the court until trial that he had difficulty scheduling services due to his previous caseworker's failure to return his calls.

In addition, the Father did not present his former attorney Solis at the hearing on his motion for new trial to testify about her actions and the reasons for those actions. There is nothing in the record before us showing counsel's trial strategy or that it was unreasonable. The Father's original trial counsel was not presented to advise the court whether she informed appellant about discovery issues or deadlines. Likewise, the Father's retained trial attorneys did not testify about what steps they took to prepare for trial or any difficulties they had in those preparations. The record reflects the Father was represented by counsel at every hearing after he was served with the termination suit, and he was represented by two attorneys at trial.

Although the record contains no evidence that any written discovery was propounded, there is likewise no evidence that such written discovery would have produced any fruits or that there was a necessity for it. *In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) (holding trial counsel's failure to file

formal discovery in termination case did not prejudice the father). Without an explanation from trial counsel for her actions, we may not, in the face of the strong presumption in favor of reasonable representation, conclude that trial counsel lacked sound strategic reasons for her conduct. *See In re B.M.*, No. 14-13-00599-CV, 2013 WL 6506659, at *11 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem. op.) (citing *M.S.*, 115 S.W.3d at 549).

The Father's complaint is not firmly established by the record; we may only speculate about why counsel may not have conducted formal discovery or what such discovery may have revealed. *See In re R.E.T.R.*, No. 14-13-00640-CV, 2013 WL 6506689, at *11 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem. op.) (rejecting claim that counsel's failure to engage in discovery constituted ineffective assistance). The Father has failed to show counsel's performance was deficient in this regard and that the alleged deficient performance prejudiced his defense. *See In re K.M.H.*, 181 S.W.3d at 9–10.

In sum, the Father has not made the showing required under *Strickland* and failed to overcome the strong presumption that counsel's alleged deficiencies prejudiced the case, deprived him of a fair trial, or produced an unreliable result. We hold the Father has not established he received ineffective assistance of counsel.

### 3. Denial of Continuance

In his motion for new trial, the Father also alleged the trial court abused its discretion and deprived him of due process by denying his motion for continuance. The decision to grant or deny a motion for continuance is within the trial court's sound discretion. *See* Tex. R. Civ. P. 251. The trial court's action in denying a continuance will not be disturbed unless the record discloses a clear abuse of discretion. *State v. Wood Oil Distrib. Inc.*, 751 S.W.2d 863, 865 (Tex. 1988).

First, our record contains no written motion for continuance. Appellant's first retained counsel, Rushing, appeared at the permanency hearing on December 12, 2014, the date trial had first been scheduled to commence. The record of that hearing does not reflect Rushing requested a continuance. In fact, at the conclusion of the hearing, when the trial court set the new trial date for January 23, 2014, Rushing replied, "That's fine."

The Father's new counsel, Acosta, orally requested a continuance at the start of trial on January 23, 2014. His stated reasons were that he needed time to subpoena a witness and review pictures of the Father's home that he had just received. He also stated he would "perhaps" do some witness preparation and some discovery, but he did not specify what he sought to discover. Absent a specific showing of what additional trial preparation might have been made, no abuse of discretion in denying a continuance is shown. *In re L.D.W.*, No. 14-11-00438-CV, 2013 WL 2247383, at *10 (Tex. App.—Houston [14th Dist.] May 21, 2013, no pet.) (mem. op.) (finding no abuse where motion for continuance did not identify witnesses to be subpoenaed, what testimony was expected to be elicited from them, or why such testimony was material). All other parties were opposed to the motion. The Department's counsel noted that only one witness out of several she planned to call was scheduled for that day and the Father's counsel would have ample time to subpoena any witnesses he might need. The motion was denied. The Department called the Father as its first witness. The Father asserts his counsel re-urged his motion for continuance when presented with documents he had not reviewed. The documents in question were a certified copy of the Father's 2010 judgment of conviction for assaulting the Mother and the complaint relating to that judgment. The Father was certainly aware of the conviction, and the court denied the oral motion. The Father's testimony was not concluded that day, and the trial was continued for over a month until February 27, 2014.

The law is well settled that a motion for continuance must be in writing, state the specific facts supporting the motion, and be verified or supported by affidavit. *See* Tex. R. Civ. P. 251, 252; *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citing *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986)). If a motion for continuance is not made in writing and verified, it is presumed that the trial court did not abuse its discretion in denying it. *E.L.T.,* 93 S.W.3d at 375 (holding that no abuse of discretion was shown where appellant did not comply with Rule 251); *see also Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 218 (Tex. App.—El Paso 2000, no pet.) (holding the denial of an oral request for a continuance does not constitute an abuse of discretion).

In *Villegas,* which the Father cited, the Supreme Court of Texas found that this presumption did not apply to a lay movant who, without fault, had his attorney withdraw his representation two days before trial and refuse to turn over the case file. 711 S.W.2d at 626. The court stated that when the reason for a continuance is the withdrawal of counsel, the party moving for the continuance must show that his failure to be represented at trial was not due to his own fault or negligence. *Id. Villegas* may be distinguished from this case in several respects. Here, the Father was not without counsel at trial. In addition, the court did not grant counsel's motion to withdraw; the court determined the Father was not entitled to appointed counsel. Moreover, the trial court clearly determined that removal of appointed counsel was due to the Father's fault in misrepresenting his financial status. The court declared, "he committed a fraud on this court."

We also find *Harrison v. Harrison,* 367 S.W.3d 822 (Tex. App.—Houston [14th Dist.] 2012, pet. denied), cited by the Father, does not control the disposition of this issue. This court held in *Harrison* that the trial court abused its discretion in denying the wife's motion for continuance after permitting her counsel to withdraw

43

over her objection forty days before trial, based on his unsupported claim that the wife had not paid all of his fees. *Id.* at 835. We also found that the wife was not at fault. *Id.* at 833–35 (citing *Villegas*, 711 S.W.2d at 626). The wife testified to her unsuccessful efforts to find a new attorney, and when her request for a continuance was denied, she proceeded to trial without counsel. *Id.* at 831–32.

Here, the Father had time to, and in fact did, retain counsel before trial. Counsel did not allege or establish any specific trial preparation that required additional time. In addition, the record supports the trial court's determination that the Father was at fault. *See Qurashi v. Jabeen,* No. 14-12-00858-CV, 2013 WL 2644182, at *5 (Tex. App.—Houston [14th Dist.] June 11, 2013, no pet.) (mem. op.) (finding no abuse of discretion in denying continuance where appellant failed to show the lack of representation was not due to his own fault or negligence). We conclude the trial court did not abuse its discretion in denying the Father's oral request for a continuance. Accordingly, we overrule the Father's first issue.

### C. Reimbursement for Attorney's Fees

Finally, in his fourth issue, the Father asserts that the trial court erred in ordering him to reimburse the county for the attorney's fees incurred by his court-appointed counsel. The Department asserts, and we agree, that the Father has waived this complaint by failing to bring it to the trial court's attention. *See* Tex. R. App. P. 33.1; *Harris Cnty. Children Protective Servs. v. Richker*, 2 S.W.3d 741, 743 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that because there was no claim in any document in the trial court that the judgment should not have ordered payment of appointed attorney fees without evidence on indigence, the complaint was waived). Nonetheless, we briefly address the issue.

The Family Code provides that a court-appointed attorney ad litem for a parent is to be paid by the parents of the child unless the parents are indigent. Tex.

Fam. Code § 107.015(a). In its petition, the Department asked that the Father reimburse the county for fees paid to the attorney ad litem if he had the money to pay those fees. Section 107.015 clearly authorizes a court to require a parent to defray the cost of attorneys appointed in the case if the court determines the parent is "able." Tex. Fam. Code §107.015(b). Only if indigency of the parents is shown may the county be ordered to pay fees for an attorney at litem for a parent. *Id.* at § 107.015(c). "The court may not award attorney ad litem fees under this chapter against the state, a state agency, or a political subdivision of the state except as provided by this subchapter." *Id.*

The Father argues that having determined he was indigent based on his affidavit, the trial court's discretion to reverse that decision was limited. We disagree. As discussed above, the Father acknowledged he was not "poor," he earned $70,000 annually, and he was not in debt. He confirmed, however, that he requested that the court appoint an attorney for him, and he testified he did not believe he should have to pay for his court-appointed attorney. The record supports the trial court's determination that the Father is not indigent. Accordingly, the court was required to order the Father to pay the court-appointed attorney ad litem's fees. *See* Tex. Fam. Code § 107.015(c).

We overrule the Father's fourth issue.

## V. CONCLUSION

Having overruled the Father's issues, we order the judgment of the trial court affirmed.

/s/     Marc W. Brown
Justice

Panel consists of Justices McCally, Brown, and Wise.

45